**PORTER | SCOTT**
A PROFESSIONAL CORPORATION
John R. Whitefleet, SBN 213301
350 University Ave., Suite 200
Sacramento, California 95825
TEL: 916.929.1481
FAX: 916.927.3706

Attorneys for Defendant BRAD ALFORD

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTOPHER STOWE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BRAD ALFORD, in his personal capacity,<br><br>Defendant.<br><br>_____/ | Case No. 2:19-cv-01652-KJM-AC<br><br>**INDEX OF EXHIBITS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: December 17, 2021<br>Time: 10:00 a.m.<br>Courtroom: 3<br>Judge: Kimberly J. Mueller<br><br>Complaint Filed: 08/23/2019 |

Defendant BRAD ALFORD hereby submits the following Index of Exhibits in support of his motion for summary judgment:

| EXHIBIT A | Declaration of Brad Alford |
|---|---|
| EXHIBIT B | Deposition Transcript of Kristopher Stowe |
| EXHIBIT C | Deputy Brad Alford Police Report |
| EXHIBIT D | Alford Body-Worn Camera Video |
| EXHIBIT E | Barrington Body-Worn Camera Video (1) |
| EXHIBIT F | Barrington Body-Worn Camera Video (2) |
| EXHIBIT G | Placer County Jail Intake Video |

1   Dated:  November 19, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,


PORTER SCOTT
A PROFESSIONAL CORPORATION

By /s/ John R. Whitefleet
    John R. Whitefleet
    Attorney for Defendant

2

**INDEX OF EXHIBITS**

# EXHIBIT A

**PORTER | SCOTT**
A PROFESSIONAL CORPORATION
John R. Whitefleet, SBN 213301
350 University Ave., Suite 200
Sacramento, California 95825
TEL: 916.929.1481
FAX: 916.927.3706

Attorneys for Defendant BRAD ALFORD

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTOPHER STOWE, an individual, | Case No. 2:19-cv-01652-KJM-AC |
| Plaintiff, | |
| v. | **DECLARATION OF BRAD ALFORD IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| BRAD ALFORD, in his personal capacity, | |
| Defendant. | Complaint Filed: 08/23/2019 |

I, BRAD ALFORD, declare as follows:

1.     I make this Declaration on my own personal knowledge except to the facts I understand on information and belief. As to such facts, I believe them to be true. If called upon to do so, I could and would competently testify about the matters asserted herein.

2.     On August 25, 2017, I was employed as a peace officer for the City of Rocklin Police Department. On this day, I was on patrol in the City of Rocklin. I was in full Rocklin Police Department uniform and drove a fully marked patrol vehicle.

3.     At approximately 7:47 p.m., I was dispatched to 4243 Cedarwood Street in Rocklin, California to check the welfare of an individual who was reported as lying in the visitor's parking lot unconscious but still breathing. The individual was later confirmed to be KRISTOPHER STOWE.

4.     I arrived at the scene and saw KRISTOPHER STOWE lying on his back with his arms spread out to his sides. I asked dispatch to send medics because I thought KRISTOPHER STOWE may

1  have been suffering from a drug overdose or a medically induced condition.

2       5.      As I approached KRISTOPHER STOWE, I announced myself as a police officer. After a

3  few seconds, KRISTOPHER STOWE regained consciousness.

4       6.      I observed that KRISTOPHER STOWE had blood shot and watery eyes, slurred speech,

5  and was emitting a strong odor of alcohol from his person. I also observed that KRISTOPHER STOWE

6  had abrasions on his face and suspected that he had fallen prior to my arrival.

7       7.      Based on those observations, I determined that KRISTOPHER STOWE was intoxicated

8  and unfit to care for himself.

9       8.      I informed KRISTOPHER STOWE that medics were on their way and asked him if he

10 had been drinking alcohol, using illegal drugs, or was having a medical emergency. KRISTOPHER

11 STOWE did not answer my questions. I repeatedly asked KRISTOPHER STOWE for his name, but he

12 only provided me with his first name. He could not provide me with his last name.

13      9.      Once the medics from the Rocklin Fire Department arrived, I observed that they began

14 asking KRISTOPHER STOWE questions about his condition. I observed KRISTOPHER STOWE

15 answer a couple questions but not all of them.

16      10.     While the medics were questioning KRISTOPHER STOWE, I heard him comment that

17 he was being asked too many questions, and that he intended to leave. I was concerned that

18 KRISTOPHER STOWE was unable to care for himself under Cal. Pen. Code §647(f) and determined to

19 detain him. I told KRISTOPHER STOWE that he needed to speak with the medics and ordered that he

20 put his hands behind his back.

21      11.     KRISTOPHER STOWE initially complied with my command and put his hands behind

22 his back. As I began to handcuff KRISTOPHER STOWE, he began pulling away from me while

23 spinning towards me. I repeatedly commanded KRISTOPHER STOWE to "stop fighting."

24 KRISTOPHER STOWE continued to resist.

25      12.     I was fearful that KRISTOPHER STOWE would flee or attack me or others at the scene.

26 For that reason, I determined that I would take KRISTOPHER STOWE to the ground in a controlled

27 manner so that I could secure him in handcuffs. KRISTOPHER STOWE continued to struggle, and

28 before I could complete the takedown, both KRISTOPHER STOWE and I fell to the ground.

**DECLARATION OF BRAD ALFORD IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT**

13.     As a result of the fall, KRISTOPHER STOWE landed on top of my legs. I could feel KRISTOPHER STOWE moving up my body towards my head. I was concerned that KRISTOPHER STOWE was attempting to get in a position of advantage over me. I was pinned underneath KRISTOPHER STOWE and could not free myself.

14.     I observed Officer Andrew Barrington kneel on the ground and strike KRISTOPHER STOWE in the side of the head with his elbow. I was then able to free my legs out from under KRISTOPHER STOWE.

15.     While KRISTOPHER STOWE was still on the ground, I observed Officer Andrew Barrington grab KRISTOPHER STOWE'S left arm and put it behind his back. I observed the medics from the Rocklin Fire Department gain control of KRISTOPHER STOWE'S right arm and put it behind his back. At that time, I placed handcuffs on KRISTOPHER STOWE.

16.     I did not hit, punch, or strike KRISTOPHER STOWE at any time, nor did I push his head into the ground.

17.     I observed Officer Barrington and the medics apply pressure to KRISTOPHER STOWE'S body and push his head toward the ground in order to restrain him while I secured him in handcuffs.

18.     I assisted KRISTOPHER STOWE in standing up and walked him to my patrol vehicle. I took KRISTOPHER STOWE to the rear passenger door, and Officer Barrington went to the rear driver's side door to assist with securing KRISTOPHER STOWE.

19.     As I was placing KRISTOPHER STOWE in the back seat of the vehicle, he began to struggle. He rolled into the foot well of the rear caged area. As I leaned in to assist KRISTOPHER STOWE in gaining an upright position on the back seat, KRISTOPHER STOWE cocked his foot back and kicked me in the chest. I observed KRISTOPHER STOWE cock his leg back again as if to kick a second time. I then observed Officer Barrington punch Stowe in the right side of his head to subdue him.

20.     During this interaction, KRISTOPHER STOWE was using profane language towards me and calling me offensive names.

21.     Because I was unable to gain KRISTOPHER STOWE'S cooperation in securing him in the back seat, I grabbed KRISTOPHER STOWE by the ankle and pulled him out of the backseat on to

{02492910.DOCX}                                    3

**DECLARATION OF BRAD ALFORD IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

1  the ground. By that time, Officer Jeff Paxton had arrived on the scene, and he assisted me in restraining

2  KRISTOPHER STOWE on the ground.

3        22.    I observed that Officer Barrington called for a WRAP restraint device. Once the restraint

4  device arrived, I along with several other officers secured KRISTOPHER STOWE in the device and

5  placed him into the back seat of my patrol car.

6        23.    I drove KRISTOPHER STOWE to Sutter Roseville Medical Center to be medically

7  cleared for incarceration, a standard practice. Because of KRISTOPHER STOWE'S uncooperative and

8  volatile demeanor, I did not remove the WRAP device while at the hospital.

9        24.    At the hospital, KRISTOPHER STOWE would not fully cooperate with the medical staff.

10  He continued to yell and curse at me and others on the scene. For that reason, the hospital cleared

11  KRISTOPHER STOWE for incarceration with limited screening.

12        25.    Upon arrival at the jail, I turned KRISTOPHER STOWE over to the custody of the Placer

13  County deputies, and he was brought inside to start the booking process by Placer County deputies.

14  Placer County deputies sat KRISTOPHER STOWE in an area ordinarily reserved for unhandcuffed

15  individuals. Because of KRISTOPHER STOWE'S location, I thought STOWE was no longer

16  handcuffed.

17        26.    While in the booking area, I heard KRISTOPHER STOWE repeatedly use profane

18  language towards me and other deputies. I heard KRISTOPHER STOWE make statements suggesting

19  physical violence towards me.

20        27.    During the time KRISTOPHER STOWE was in the booking area, I perceived that he was

21  belligerent and hostile towards me.

22        28.    The intake nurse instructed that I take KRISTOPHER STOWE to Sutter Auburn Faith

23  Hospital for further assessment.

24        29.    I approached KRISTOPHER STOWE, who was still seated, to inform him that we were

25  going back to the hospital. My intent was to gain KRISTOPHER STOWE'S cooperation so that I did

26  not have to place him back in the WRAP device.

27        30.    As I engaged KRISTOPHER STOWE, he immediately began cursing at me and made

28  another statement that I perceived to be threatening.

{02492910.DOCX}                    4

**DECLARATION OF BRAD ALFORD IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

31.    To get KRISTOPHER STOWE'S attention, I bent over closer to him and raised the volume of my voice. While I was speaking, KRISTOPHER STOWE abruptly began to stand up in my face. I had not instructed KRISTOPHER STOWE to stand up, nor had he informed me of his intent to stand up. He was yelling at me as he stood up.

32.    Considering that KRISTOPHER STOWE had already been violent with me, and in light of his belligerent and hostile demeanor towards me and his threatening statements, and given his proximity to me, I was fearful that KRISTOPHER STOWE may attempt to head butt me or cause me other physical harm.

33.    As KRISTOPHER STOWE was standing up, I reached out my right hand and made contact with KRISTOPHER STOWE'S upper left chest area in an attempt to control him. I realized that I could not control him with one hand. For that reason, I moved my left hand to KRISTOPHER STOWE'S right shoulder to gain better control. Because of the angle and momentum of KRISTOPHER STOWE'S body, my contact only drove him backwards against the room divider behind him. The movement of his body backwards simultaneously caused my hands to inadvertently slide up towards his neck area.

34.    I heard what I understood to be a deputy say "whoa, whoa", which suggested to me that they were interfering and would take control. At that time, I immediately ceased physical contact with KRISTOPHER STOWE.

35.    While both of my hands were touching KRISTOPHER STOWE'S neck area for less than two seconds, I did not apply pressure in any attempt to restrict his air supply.

36.    On August 26, 2017, I prepared a police report documenting the interaction with KRISTOPHER STOWE. It is attached as Exhibit C to the Index of Exhibits and is a true and correct copy. Attached to my police report is a true and correct copy of the supplemental report prepared by Officer Andrew Barrington.

37.    During a portion of my interaction KRISTOPHER STOWE on August 25, 2017, I had my body-worn camera turned on. Exhibit D, attached to the Index of Exhibits, is a true and correct copy of the footage captured by my body-worn camera on August 25, 2017.

**DECLARATION OF BRAD ALFORD IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

38.     I understand that Officer Andrew Barrington had his body-worn camera turned on during the interaction with KRISTOPHER STOWE on August 25, 2017. Exhibits E & F are true and correct copies of the footage captured by Officer Barrington's body-worn camera on August 25, 2017.

I declare under penalty of perjury pursuant to the laws of the State of California and the United States that the foregoing is true and correct, and if called to testify as a witness in this matter I can and will testify competently as to the matters of fact contained herein based upon my personal knowledge.

This declaration was executed on the _____ day of _____ 2021, in _____, California.


_____
Brad Alford
Declarant

**DECLARATION OF BRAD ALFORD IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

was belligerent and hostile towards me.

~~The nurse instructed that I take KRISTOPHER STOWE to Sutter Auburn Faith~~ Hospital for further assessment.

29.     I approached KRISTOPHER STOWE, who was still seated, to inform him that we were going back to the hospital. My intent was to gain KRISTOPHER STOWE'S cooperation so that I did not have to place him back in the WRAP device.

30.     As I engaged KRISTOPHER STOWE, he immediately began cursing at me and made another statement that I perceived to be threatening.

31.     To get KRISTOPHER STOWE'S attention, I bent over closer to him and raised the volume of my voice. While I was speaking, KRISTOPHER STOWE abruptly began to stand up in my face. I had not instructed KRISTOPHER STOWE to stand up, nor had he informed me of his intent to stand up. He was yelling at me as he stood up.

32.     Considering that KRISTOPHER STOWE had already been violent with me, and in light of his belligerent and hostile demeanor towards me and his threatening statements, and given his proximity to me, I was fearful that KRISTOPHER STOWE may attempt to head butt me or cause me other physical harm.

33.     As KRISTOPHER STOWE was standing up, I reached out my right hand and made contact with KRISTOPHER STOWE'S upper left chest area in an attempt to control him. I realized that I could not control him with one hand. For that reason, I moved my left hand to KRISTOPHER STOWE'S right shoulder to gain better control. Because of the angle and momentum of KRISTOPHER STOWE'S body, my contact only drove him backwards against the room divider behind him. The movement of his body backwards simultaneously caused my hands to inadvertently slide up towards his neck area.

34.     I heard what I understood to be a deputy say "whoa, whoa", which suggested to me that they were interfering and would take control. At that time, I immediately ceased physical contact with KRISTOPHER STOWE.

35.     While both of my hands were touching KRISTOPHER STOWE'S neck area for less than two seconds, I did not apply pressure in any attempt to restrict his air supply.

36.     On August 26, 2017, I prepared a police report documenting the interaction with KRISTOPHER STOWE. It is attached as Exhibit C to the Index of Exhibits and is a true and correct copy. Attached to my police report is a true and correct copy of the supplemental report prepared by Officer Andrew Barrington.

37.     During a portion of my interaction KRISTOPHER STOWE on August 25, 2017, I had my body-worn camera turned on. Exhibit D, attached to the Index of Exhibits, is a true and correct copy of the footage captured by my body-worn camera on August 25, 2017.

38.     I understand that Officer Andrew Barrington had his body-worn camera turned on during the interaction with KRISTOPHER STOWE on August 25, 2017. Exhibits E & F are true and correct copies of the footage captured by Officer Barrington's body-worn camera on August 25, 2017.

I declare under penalty of perjury pursuant to the laws of the State of California and the United States that the foregoing is true and correct, and if called to testify as a witness in this matter I can and will testify competently as to the matters of fact contained herein based upon my personal knowledge.

This declaration was executed on the 14 day of November 2021, in Sacramento California.

Brad Alford

Declarant

*Brad Alford*

**DECLARATION OF BRAD ALFORD IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# **<u>EXHIBIT B</u>**

```
 1    A.        Yeah.

 2    Q.        Okay.  And what -- what about the incident have

 3    you told your grandmother?

 4    A.        That I was beat up by a cop and choked and

 5    that -- that I hurt my back really bad.  And, you know,    11:00:54

 6    I just -- I told her, you know, that I -- you know, I'm

 7    sorry for screwing up.  I don't know.  That was like

 8    basically it, you know.

 9    Q.        How many times have you spoken with your

10    grandmother about the August 25th incident?               11:01:22

11    A.        I try not to talk about it with her because

12    it's just a lot for her, you know.  I don't, you know,

13    get into -- like she doesn't need to, you know, hear all

14    of the --

15    Q.        When you said you told her sorry for screwing    11:01:41

16    up, what did you mean?

17    A.        Because I relapsed.  You know, I drank.  So --

18    and I was in jail.

19    Q.        Okay.  Do you want to take a quick break for

20    your back?                                                 11:02:17

21    A.        Yes, please.

22    Q.        Okay.  Take five again?

23    A.        All right.

24              MR. PATTERSON:  That works.

25              THE VIDEOGRAPHER:  The time is 11:02 a.m.  We     11:02:23
```

Page 85

1   know, I knew he was arresting me or apprehending me or

2   whatever.  And, you know, I started to put my hands

3   behind my back.

4           At first I was like I didn't -- you know, I was

5   like, well, what's going on, kind of like thinking in my     11:21:33

6   head like what's going on, you know.  Like, you know, I

7   haven't done anything wrong, you know.  Like what -- you

8   know, I'm being arrested for falling asleep?  Like --

9   you know, it's like I haven't hurt nobody, I haven't

10  done anything, you know, so I was confused by the whole     11:21:48

11  thing.

12          And -- but, you know, I -- when I was putting

13  my hands behind my back, I -- I don't know if I was like

14  thrown to the ground or what, but, you know, it --

15  really it threw me off.  And, you know, I don't know if     11:22:06

16  I hit my head then or what, but, you know, I was kind of

17  in and out.  I -- you know, I just -- I remember

18  yelling, you know, that I can't breathe.  That -- you

19  know, my back -- I had -- you know, I had back problems

20  already, and he was hurting my back.                         11:22:38

21          And I -- I remember when I was yelling, he was

22  smashing my head on the -- like on the pavement.  And I

23  think -- I don't know if that's how I chipped my teeth

24  or what, but -- yeah, I don't -- and, you know, I -- I

25  just remember panicking.  And I was like just rolling --    11:23:20

Page 91

1    shoulder area?

2    A.      Yes.

3    Q.      Was your hand underneath your body?

4    A.      It -- it could have been.  I mean I -- it could

5    have been because I mean after like -- you know, I -- I    11:39:50

6    was a little caught off by everything.

7    Q.      All right.  So once -- once you're on the

8    ground, what's the next thing in terms of an area of

9    pressure on your body, where do you feel pressure?

10   A.      On my back.                                        11:40:32

11   Q.      Where on your back?

12   A.      I was pretty sure that they had like a leg on

13   my back.  It was on my lower back.

14   Q.      And why do you believe it was a leg?

15   A.      The pressure -- the pressure on my -- because     11:40:51

16   that's what it felt like.

17   Q.      Is it because it was in a particular --

18   A.      Or an elbow.  Huh?

19   Q.      Was it -- was -- the pressure that you felt,

20   was it across the entirety of your back or was it at a    11:41:07

21   pinpoint area?

22   A.      No.  It was kind of like -- like -- just

23   felt -- felt like -- felt like a knee.  I don't know how

24   else to --

25   Q.      And would you agree that the pressure that felt   11:41:35

Page 101

```
 1    like a knee is more like a pinpoint area --

 2    A.        Maybe down I guess.

 3    Q.        -- as opposed to a long area?

 4    A.        Not a leg.  I don't think it was a leg, but --

 5    Q.        And so where did you feel the pinpoint area of    11:41:48

 6    pressure along your lower back?

 7    A.        Like my -- kind of like my kidney area or, you

 8    know, the lumbar area.

 9    Q.        Did you feel any other pressure anywhere else?

10    A.        On my arm.                                         11:42:04

11    Q.        Which arm?

12    A.        My right arm.

13    Q.        Where was your right arm?

14    A.        I don't know.

15    Q.        Was it behind your back, underneath you?          11:42:14

16    A.        Huh?  Oh, where on my arm?

17    Q.        Actually, that's a better question.  Where on

18    your arm did you feel pressure?

19    A.        On my bicep.

20    Q.        How long did you feel the pressure in your --     11:42:35

21    in your kidney area?

22    A.        I don't -- it all happened so fast.

23    Q.        Less than five seconds?

24    A.        I don't know.

25    Q.        Less than one second?                             11:43:00
```

                                                        Page 102

```
 1    A.       Longer than that.

 2    Q.       Okay.  So is it -- are you able to estimate

 3    that it's longer than two seconds?

 4    A.       Yeah.

 5    Q.       Longer than three seconds?                   11:43:14

 6    A.       Yeah.  Yeah.

 7    Q.       Longer than four seconds?

 8    A.       I believe it's -- I -- I would say like ten --

 9    maybe ten seconds or so.  And then -- yeah.  I'd say ten

10    seconds.                                              11:43:35

11    Q.       Your best estimate is a knee pressure that you

12    felt or the pressure that you attribute to a knee --

13    A.       Yeah.  I felt a lot.  Like, I don't know,

14    like -- yeah.

15    Q.       Let me ask that again because I'm not sure the  11:43:49

16    record is clear.

17             The pressure you felt in your kidney area that

18    you attribute to a knee, your best estimate of the

19    length of that pressure is around ten seconds?

20    A.       Yeah.  I think so, yeah.  I mean to the best of  11:44:04

21    my knowledge.  I -- it happened so fast, it's --

22    Q.       And the pressure on your right bicep, did your

23    arm -- did it get moved in any particular direction

24    after you felt the pressure in your right bicep area?

25    A.       Yeah, I think -- I mean I -- I might have moved  11:44:27
```

Page 103

1    my arm.  I don't --

2    Q.      Okay.  So are you feeling pressure anywhere

3    else besides your back and your right arm?

4    A.      Can you repeat the question?

5    Q.      Sure.  You had indicated that you felt pressure   11:44:53

6    on your right arm bicep and your lower back kidney area.

7            Did you feel pressure anywhere else?

8    A.      Well, yeah.  On my upper back.  I -- I wasn't

9    sure if it was like an elbow or hand or -- you know.  I

10   know there was two -- there was two officers that were      11:45:16

11   there.

12   Q.      How do you know there were two officers?

13   A.      Because I believe another officer pulled up and

14   I heard them talking.  I think I was -- I -- I might

15   have been -- I might have talked to them, I don't know.   11:45:34

16   Q.      All right.  So --

17   A.      That was a long time ago.

18   Q.      Once -- once you said you were on the ground,

19   you felt pressure on your back and your right arm, what

20   happened after feeling that pressure?                      11:46:02

21   A.      I don't know.  I was -- I might have rolled

22   over.  I really don't know.  I --

23   Q.      When you say you might have rolled over, why

24   would you say that?

25   A.      I don't know.                                       11:46:42

Page 104

1    Q.      As you sit here today, do you have a memory of

2    rolling over before you were placed in handcuffs?

3    A.      Yeah.  I mean yes, I -- I mean I'm not saying

4    that I was -- you know, I was -- didn't know what was

5    going on, you know.  I'm not saying that I was like, you    11:47:04

6    know, the most -- I wasn't saying, you know, like -- I

7    was fine up until I got thrown, you know, thrown down to

8    the ground and stuff.  And I didn't know what was going

9    on.  You know, I -- I --

10   Q.      So what happened -- or when you say you rolled    11:47:33

11   over, can you describe that for me, did you get all the

12   way on your back?

13   A.      Well, I was on my -- I was on my chest.  I

14   might have been on my back or halfway or --

15   Q.      And does that mean -- "halfway" means different    11:47:53

16   things to different people.

17   A.      I mean like I was on my side, and then I was --

18   I rolled -- I could have rolled back on my chest.  Like

19   I said, it all happened so fast.

20   Q.      Okay.  When you -- do you have a recollection    11:48:09

21   of your view changing and rolling to your side and

22   seeing something different?

23   A.      Yes.  Yeah.  And -- and, you know, I was, you

24   know, moving -- I moved my head because, you know,

25   somebody was on my back and I was -- you know, I was    11:48:31

Page 105

```
1    like -- I think I had one arm underneath -- underneath

2    me.  And I don't -- they were trying to get my arm.  I

3    don't know.  And --

4    Q.      Did you ever use your legs as you were

5    trying -- as you either rolled over or on your side to    11:49:09

6    wrap your legs around any of the officers?

7    A.      Not that I recall.

8    Q.      Were you ever on top of Officer Alford in any

9    way?

10   A.      Not that I know of.                              11:49:34

11   Q.      All right.  When you said you might have rolled

12   over to your side or your back, was this before or after

13   you felt your head smashing onto the pavement?

14   A.      This was after.

15   Q.      Okay.  So then go back to -- actually --         11:50:02

16   actually, I'm not sure if that testimony is clear.

17           Did you roll over onto your back or your side

18   before you felt your head being smashed to the pavement?

19   A.      Can you repeat the question?

20   Q.      Yeah.  So I'm trying to get a sequence of        11:50:34

21   events.  You felt pressure on your lower back, upper

22   back, and your right bicep.  At some point you said you

23   might have rolled over to your back or your side.

24           My question is -- is prior to rolling over to

25   your back or your side, did you experience your head     11:50:56
```

Page 106

1    being smashed into the pavement?

2    A.        Yeah.  Yeah.  Prior to -- yeah, prior to me

3    rolling around?  Yes.  I mean like it -- it all

4    happened -- like I said, it all happened so quickly.

5    Q.        Okay.  So the -- did you experience any -- any    11:51:13

6    sensation that your head was being smashed into the

7    pavement after you rolled over onto your back or your

8    side?

9    A.        I might have.  It -- I was kind of out of it

10   after that, so --                                        11:51:36

11   Q.        Okay.  So when you -- how many times did you

12   feel your head being smashed into the pavement?

13   A.        Once, twice.

14   Q.        And when you --

15   A.        And then, you know, they were holding my head    11:51:51

16   down and I was trying to -- I was moving my head.  And

17   they were -- you know, I was screaming saying, you know,

18   "Get" -- you know, "Get off."  And, you know, that I was

19   being hurt.  And --

20   Q.        Did you -- when you say you said you were         11:52:11

21   screaming "Get off," do you remember saying those

22   specific words?

23   A.        Well, I remember saying, "I can't breathe."  I

24   might have said -- you know, I might have said, "Get

25   off."                                                     11:52:25

                                                      Page 107

1    Q.      As you sit here today, can you tell me for sure

2    whether you did or not?

3    A.      No, I can't.

4    Q.      But you for sure recall saying you can't

5    breathe?                                          11:52:37

6    A.      Yes.  I for sure, yes.  I remember saying that.

7    Q.      And anything else you -- you recall saying?

8    A.      I remember telling him that I -- that I had

9    back issues and that he was hurting my back.

10   Q.      Is this while you're still --              11:52:53

11   A.      I --

12   Q.      -- laying down on the ground?

13   A.      It was when I was feeling a lot of pressure on

14   my back.

15   Q.      And before you were in handcuffs?           11:53:07

16   A.      Yes.  When they were apprehending me.

17   Q.      Right.  I'm just trying to get a timeline.

18           You're still -- you said you had back issues to

19   whoever was listening as you're prone on the ground and

20   before you felt your head being held down or smashed    11:53:31

21   into the pavement?

22   A.      Can you repeat the question?

23   Q.      Sure.  When you -- you said you told anyone who

24   was listening that you had back issues as you were

25   feeling the pressure on your -- on your back.          11:53:52

Page 108

1            Was this before or after you felt your head

2   being held down and smacked on the pavement?

3   A.     I don't -- I don't recall.

4   Q.     How was your head positioned when you said you

5   were being held down or smashed in the pavement, were   11:54:10

6   you straight on, were you to the right, to the left?

7   A.     Both.  I was -- I was moving my head around

8   like that.  And I was lifting my head up, and they were

9   trying to push it -- they were, you know, telling me to

10   get down, you know.  And I just remember that I didn't   11:54:28

11   know -- you know, I was -- I was scared.  Yeah.

12   Q.     So once -- once you said you rolled over either

13   onto your back or your side, what happened after that?

14   A.     Well, I -- I -- I don't -- it happened such a

15   long time ago, I don't -- I don't know.  It might have   11:55:03

16   been -- they might have arrested me.  I was pretty

17   exhausted and I know I -- I kind of fell asleep for a

18   little bit, you know.  I don't -- I don't --

19   Q.     Can you tell me how you went from being on your

20   back or your side to in handcuffs?   11:55:41

21   A.     Can you repeat the question?

22   Q.     Sure.  Can you describe for me how you went

23   from -- you said you moved to your back or to your

24   side -- how you went from that position to handcuffs?

25   A.     I can't -- I don't -- I have no idea.  I don't   11:56:00

Page 109

1    Q.       Do you remember that brace being put on you at

2    all?

3    A.       Not really.

4    Q.       Okay.  When you first realized you were in this

5    yellow and black brace, where were you?                    11:58:08

6    A.       I was in the car.

7    Q.       Do you have any memory from being prone on the

8    ground on your back or on your side to the moment that

9    you were -- you realized you were in this yellow and

10   black brace?                                               11:58:50

11   A.       Can you repeat the question?

12   Q.       Sure.  Do you have any memory at all as you sit

13   here today from the moment that you were prone on your

14   back or your side before you were in handcuffs to the

15   moment that you were now in this yellow and black brace?   11:59:02

16   A.       Yeah, I -- I -- I don't recall.  Yeah, I

17   don't -- I don't remember them putting it on.

18   Q.       Do you remember being placed into the patrol

19   car -- or the back of the patrol car before this yellow

20   and black brace was put on?                                11:59:28

21   A.       Not -- not really, no.  I don't really remember

22   it.  I remember kind of waking up and them closing the

23   door.  And I was like -- I didn't know what the heck was

24   going on, and we were like driving off.  And then that

25   was basically -- I remember like we were -- I don't        11:59:48

Page 111

```
 1    different -- a different officer because of the way I

 2    was treated when I was being apprehended.

 3            And he grabbed me by my throat -- I stood up

 4    and I was in handcuffs, you know, and he grabbed me

 5    by -- with both hands and held me over the -- the        12:10:05

 6    divider and ruptured my disc.

 7    Q.        All right.  So you said you stood up.  Were you

 8    sitting in the booking area?

 9    A.        Well, yes.  Yeah.  I was -- I was sitting --

10    this was I believe the second time that I went to --      12:10:37

11    that I was in the booking area.  And there was -- I

12    think there was two officers that were -- that were

13    there that were watching.  And I was sitting and he

14    was -- I can't remember exactly what he was saying to

15    me, you know.  And he was like standing over me talking   12:11:11

16    to me.  And I got up because I wanted to -- I was going

17    a get away from him.  And, you know, I didn't -- it

18    didn't -- I didn't feel comfortable around him.  And he

19    grabbed me.  And my hands were behind my back.  And he

20    held me with both hands over -- there's like a divider.   12:11:32

21    And he pushed me back and grabbed me with both hands.

22    Q.        All right.  So prior to you -- prior to you

23    standing up, you said he was -- that Officer Alford was

24    standing over you.  What do you mean?

25    A.        Like he was -- like I was sitting right here     12:11:59
```

Page 117

1   and like he was like to the -- to the right of me.  And

2   then he was like kind of hovering -- hovering over me

3   like -- I can't -- like I said, I can't remember exactly

4   what he was saying, but he was --

5   Q.      How -- how close -- you say he's standing over   12:12:21

6   you.

7   A.      He was like a foot -- he was like a foot away

8   it seemed like.  Maybe a foot away.

9   Q.      And was he standing straight up or was he

10  leaning over?                                           12:12:32

11  A.      I think he was like -- I think he was leaning

12  over.

13  Q.      And did Officer Alford at anytime tell you to

14  stand up?

15  A.      No, he didn't -- he didn't tell me to stand up.  12:12:45

16  Q.      Did anyone order you to stand up?

17  A.      No, they didn't order me to stand up.

18  Q.      Okay.  So Officer Alford is about a foot away

19  leaning, and then you stand up.

20          Did you tell Officer Alford that you were going  12:13:03

21  to stand up?

22  A.      I -- I can't remember.  I was -- I told -- I --

23  it was -- there's a lot going on.  I remember telling

24  him that I didn't want him near me and that I didn't

25  feel comfortable around him.  And, you know, he -- we --  12:13:21

Page 118

```
1    A.       Yes.   I complained about back pain and they

2    said they were going to give me -- they said they would

3    give me some Norcos.   I said I don't -- I said I'm

4    trying to get clean and -- you know.   And that's --

5    Q.       So do you believe that for any of the trips to    12:47:18

6    the hospital prior to booking were you given any

7    prescription medication?

8    A.       Not that I know of.

9    Q.       Going back to the moment that you were down on

10   the ground, you felt pressure on your back and you felt    12:48:03

11   pressure on your right arm but before you rolled over,

12   did you ever feel like you were being struck or hit?

13   A.       No.   No, I don't --

14   Q.       Okay.

15   A.       No.                                              12:48:28

16   Q.       At any point up until -- well, from what you

17   remember, did any officer strike you or hit you?

18   A.       No, not -- I -- not that I recall.   I -- I -- I

19   do know like my eyes were like swollen shut like when

20   I -- when I -- my -- when they took my picture for the    12:49:10

21   booking photo.   Like they were like putting -- they were

22   really swollen like I did get hit.

23   Q.       Do you know whether you complained at either

24   trip to the hospital about any injuries to your eye

25   area?                                                     12:49:41
```

Page 127

```
1    Q.       You indicated that you believe at one point

2    Officer Alford told another officer to not loosen the

3    handcuffs --

4    A.       Yeah.

5    Q.       -- is that your testimony?                    12:51:43

6    A.       To the best of my knowledge, yeah.

7    Q.       When did that occur?

8    A.       I don't know exactly when.  I remember -- I

9    know it was one of the times in the booking area.

10   Q.       Was it the first or second time?             12:51:54

11   A.       I -- I don't recall.

12   Q.       During your interaction with Officer Alford, do

13   you believe you were cooperative?

14   A.       You know, I -- I'm not saying that I was fully

15   cooperative, but I feel that if I was treated a little  12:52:34

16   bit -- I don't know, if circumstances were different

17   maybe -- yeah, I definitely -- I was cooperative with

18   other officers when --

19   Q.       When -- I'm going back.  Sorry I'm jumping

20   around a little bit.                                   12:52:59

21            When you were on the ground and you said you

22   moved on your back or to your side, did you see any

23   other officer put hands on you?

24   A.       I -- I think there was another officer that

25   was -- that was to the right or -- yeah.  If I was on   12:53:22
```

Page 129

# EXHIBIT C

## ROCKLIN POLICE DEPARTMENT - 3104

**4080 ROCKLIN RD     ROCKLIN, CA 95677     916-625-5400**

### CRIME REPORT

Page 1

Case
17-237-15

### OFFENSES

| Offenses | Description | Fel/Misd |
|---|---|---|
| 69 PC | Obstruct/Resist Exec Off | Felony |
| 243(B) PC | Battery on a Peace Officer | Misd |
| 647(F) PC | DISORDERLY CONDUCT:ALCOHOL | Misd |
| 3056 PC | VIOLATION OF PAROLE - FELONY | Felony |

| Date Occurred | Time Occurred | Incident # |
|---|---|---|
| 08/25/2017 | 1947 | 1708250245 |

| Date Reported | Time Reported |
|---|---|
| 08/25/2017 | 1947 |

Related Cases

| Date Printed | Time Printed | Printed By |
|---|---|---|
| 08/28/2019 | 10:36:32 | 227 |

| Latitude | Longitude |
|---|---|
| 38.786200 | -121.228300 |

| Location | | Beat | Area |
|---|---|---|---|
| Sierra Lakes Mhp, 4243 Cedarwood St, Rocklin, CA 95677 | | 2 | 45 |

| Disposition | Dispo Date |
|---|---|
| CLEARED BY ADULT ARREST | 08/26/2017 |

| Location Type | Location of Entry | Method of Entry | Point of Entry | Alarm System | Means of Attack (Robbery) |
|---|---|---|---|---|---|
| PARKING LOT | | | | | |

### VICTIM

Victim
Officer Alford

Residence Address
4080 Rocklin Rd, Rocklin, CA 95677

Business Name and Address

| Drivers License | Cell Phone | Email |
|---|---|---|

| Notified of Victim Rights | Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|---|
| No | 916-625-5400 | | | M | |

| Business Phone | Height | Wt | Hair | Eyes |
|---|---|---|---|---|

Assistance Rendered/Victim Disposition
OTHER

Description of Injuries
Apparent Minor Injury

| Transporting Agency | Means of Attack (Assaults) |
|---|---|
| | Simple Assault Minor or No Injury |

Other Information

### WITNESS

WITNESS
Brown, Don

Residence Address
4260 Fernwood St, Rocklin, CA 95677

Business Name and Address

| Drivers License | Cell Phone | Email |
|---|---|---|
| ▓ | 276-0961 | |

| Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|
| 916-276-0961 | ▓ | 70 | M | W |

| Business Phone | Height | Wt | Hair | Eyes |
|---|---|---|---|---|
| | 5'10" | 220 | BRO | BRO |

### (Suspect)

Suspect Name

Residence Address

Business Name and Address

Identifying Features

Aliases

| Action Taken | Charges |
|---|---|

| Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|

| Business Phone | Height | Wt | Hair | Eyes |
|---|---|---|---|---|

| Cell Phone | Drivers License | Arrest Number |
|---|---|---|

Val Damaged

### VEHICLES

| Status | Vehicle Make and Model | License/State | VIN |
|---|---|---|---|

### OFFICERS

| Prepared By | Date | Assisted By | Approved By | Date |
|---|---|---|---|---|
| 218 - Alford, Brad | 08/25/2017 | 283 - Barrington, Andrew | 259 - Jensen, Gregory | 08/28/2017 |

| Routed To | Date | Routed To | Date | Notes |
|---|---|---|---|---|
| Placer Co DA | 08/25/2017 | | | |
| Parole (Auburn) | 08/28/2017 | | | |
| Placer Co DA | 10/20/2017 | | | |

CONTROLLED DOCUMENT - LAW ENFORCEMENT PURPOSES ONLY

ALFORD 00001

## ROCKLIN POLICE DEPARTMENT - 3104

**4080 ROCKLIN RD    ROCKLIN, CA 95677    916-625-5400**

### CRIME REPORT

Page 2

Case 17-237-15

| RPTING PARTY | | | | | | | |
|---|---|---|---|---|---|---|---|
| **REPORTING PARTY** Peer, Dave | **Drivers License** | | **Cell Phone** | **Email** | | | |
| **Residence Address** 4243 Cedarwood St, Rocklin, CA 95677 | | | **Residence Phone** 765-0495 | **DOB** | **Age** 63 | **Sex** W | **Race** |
| **Business Name and Address** None | | | **Business Phone** | **Height** 5'11" | **Wt** 180 | **Hair** GRY | **Eyes** BLU |

| WITNESS | | | | | | | |
|---|---|---|---|---|---|---|---|
| **WITNESS** Chad Vert | **Drivers License** | | **Cell Phone** | **Email** | | | |
| **Residence Address** Rocklin Fire Department, Rocklin, CA 95677 | | | **Residence Phone** 916-625-5313 | **DOB** | **Age** | **Sex** M | **Race** |
| **Business Name and Address** Rocklin Fire Department, 3970 Rocklin Rd, Rocklin, CA 95677 | | | **Business Phone** 916-625-5313 | **Height** | **Wt** | **Hair** | **Eyes** |

| WITNESS | | | | | | | |
|---|---|---|---|---|---|---|---|
| **WITNESS** Felkins, William | **Drivers License** | | **Cell Phone** | **Email** | | | |
| **Residence Address** Rocklin Fire Department, Rocklin, CA 95677 | | | **Residence Phone** 916-625-5313 | **DOB** | **Age** | **Sex** | **Race** |
| **Business Name and Address** | | | **Business Phone** | **Height** | **Wt** | **Hair** | **Eyes** |

| WITNESS | | | | | | | |
|---|---|---|---|---|---|---|---|
| **WITNESS** Glaziner, Jeremy Adam | **Drivers License** ▓ | | **Cell Phone** ▓ | **Email** | | | |
| **Residence Address** Rocklin Fire Department, Chico, CA 95677 --- ▓ | | | **Residence Phone** ▓ | **DOB** ▓ | **Age** 31 | **Sex** M | **Race** W |
| **Business Name and Address** Rocklin Fire Department, 3970 Rocklin Rd, Rocklin, CA 95677 | | | **Business Phone** 916-625-5313 | **Height** 6'3" | **Wt** 200 | **Hair** BRO | **Eyes** GRN |

| WITNESS | | | | | | | |
|---|---|---|---|---|---|---|---|
| **WITNESS** Hargens, Edward Donald | **Drivers License** ▓ | | **Cell Phone** 916-297-0144 | **Email** | | | |
| **Residence Address** 4256 Cedarwood St, Rocklin, CA 95677 | | | **Residence Phone** 824-4592 | **DOB** ▓ | **Age** 53 | **Sex** M | **Race** |
| **Business Name and Address** | | | **Business Phone** | **Height** 5'11" | **Wt** 185 | **Hair** BRO | **Eyes** HAZ |

| WITNESS | | | | | | | |
|---|---|---|---|---|---|---|---|
| **WITNESS** McMillen, Andriea Jean | **Drivers License** ▓ | | **Cell Phone** 288-5199 | **Email** | | | |
| **Residence Address** 4270 Oakwood St, Rocklin, CA 95677 | | | **Residence Phone** 624-2735 | **DOB** ▓ | **Age** 40 | **Sex** F | **Race** W |
| **Business Name and Address** Sierra Lakes Mobile Home, 4300 Rocklin Rd, Rocklin, CA 95677 | | | **Business Phone** 624-2735 | **Height** 5'5" | **Wt** 149 | **Hair** BRO | **Eyes** BLU |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **DETENTION ONLY - DA DECLINED TO FILE** Stowe, Kristopher Robert | **Drivers License** D4820738 CA | | **Cell Phone** 916-410-8111 | **Email** | | | |
| **Residence Address** 4256 Cedarwood St, Rocklin, CA 95677 | | | **Residence Phone** REFUSED | **DOB** 08/28/1989 | **Age** 27 | **Sex** M | **Race** W |
| **Business Name and Address** | | | **Business Phone** | **Height** 5'8" | **Wt** 200 | **Hair** BLN | **Eyes** GRN |

CONTROLLED DOCUMENT - LAW ENFORCEMENT PURPOSES ONLY

ALFORD 00002

| | ROCKLIN POLICE DEPARTMENT - 3104 | | Page 3 |
|---|---|---|---|
| | 4080 ROCKLIN RD     ROCKLIN, CA 95677     916-625-5400 | | |
| | CRIME REPORT - PROPERTY | | 17-237-15 |

| ID No. | Status/Disposition | Property Description | Value | Val Recovered | Val Damaged |
|---|---|---|---|---|---|
| 1 | DIGITAL ATTACHMENTS | 1 Phtos - PHOTOS TAKEN | | | |

CONTROLLED DOCUMENT - LAW ENFORCEMENT PURPOSES ONLY

ALFORD 00003



| **ROCKLIN POLICE DEPARTMENT - 3104** | Page  4 |
|---|---|
| 4080 ROCKLIN RD    ROCKLIN, CA 95677    916-625-5400 **NARRATIVE** | 17-237-15 |



*CONTROLLED DOCUMENT - LAW ENFORCEMENT PURPOSES ONLY*

On 8-25-17 at 1947 hours, Officer Barrington and I were dispatched to Cedarwood St./Creekside Dr. In Rocklin, CA to check the welfare of S/A-Stowe who was reported as laying in the visitor's parking lot unconscious but breathing.

I arrived on scene and saw S/A-Stowe laying on his back with his arms spread out to the side. I asked dispatch to send medical because I thought Stowe may be suffering from a drug overdose or some other medically induced condition.

As I got out of my car and walked up to S/A-Stowe, I turned on my body worn camera. The following is a summary of my contact with Stowe. Refer to the video from my body worn camera for more details.

I announced myself as a Police Officer and used my foot to push on S/A-Stowe's left foot trying to wake him up. After a few seconds, Stowe regained consciousness. I noticed Stowe had blood shot watery eyes, I could smell the strong odor of an alcoholic beverage coming from his breath, and his speech was slurred. Based on my training and experience, I believed Stowe was intoxicated and unable to care for himself.

I told S/A-Stowe that I had medics on the way and asked him if he had been drinking alcoholic beverages, using illegal drugs, and/or having some sort of medical emergency. Stowe didn't really answer any of the questions. I asked Stowe his name, but he would only tell me "Chris."

S/A-Stowe reached his hand up asking me to help him stand up. I told Stowe to wait a second since medical was on the way, and I didn't have any gloves ( I had done a quick check for weapons and noticed Stowe was soaking wet).

S/A-Stowe stood up just as the fire department and AMR were arriving on scene. I asked Stowe to sit back down, so medical could evaluate him.

I noticed a backpack on the ground next to S/A-Stowe and asked him if it belonged to him. Stowe denied owning the backpack. I looked through the backpack and couldn't find anything inside it with Stowe's name on it.

Fire Fighter Glaziner began trying to speak with S/A-Stowe about his medical condition but wasn't receiving any cooperation.

A woman came up to us and identified herself as the mobile home park manager stating she didn't know S/A-Stowe for sure but thought he may have been previously warned to not be at the property.

S/A-Stowe made a comment about how people were asking him too many questions, and he was just going to walk away. I told Stowe he couldn't walk away as he stood up. I told Stowe that since he wasn't cooperating with medics he needed to put his hands behind his back. Stowe put his hands behind his back but then began pulling away from me while spinning towards me.

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 218 | ALFORD, BRAD | 08/26/2017 | 259 | JENSEN, GREGORY | 08/27/2017 |



| ROCKLIN POLICE DEPARTMENT - 3104 | Page 5 |
|---|---|
| 4080 ROCKLIN RD    ROCKLIN, CA 95677    916-625-5400<br>NARRATIVE | 17-237-15 |

*CONTROLLED DOCUMENT - LAW ENFORCEMENT PURPOSES ONLY*

Not wanting S/A-Stowe to flee or attack me or the other people on scene, I attempted to take him to the ground for better control to handcuff. Before I could complete my take down, we both fell to the ground.  Stowe and I fell over together, and he ended up on top of my legs. I could feel that Stowe was moving up my body and was concerned that he was trying to get to a position of advantage over me, so he could continue attacking me. While loudly telling Stowe to "quit fighting" I began trying to free myself from his grasp.

Officer Barrington came over, he had been off to the side talking to the woman who had identified herself as the mobile home park manager, and engaged S/A-Stowe.  I was able to get my legs out from under Stowe and grabbed on to his upper body forcing him to the ground.

In this position, I was able to get to my radio and call for emergency help.

Fire Fighter Glaziner helped me to get control of S/A-Stowe's right arm as I heard Officer Barrington announce that he had control over Stowe's left arm.  I secured Stowe in handcuffs.

I let dispatch know that we had secured S/A-Stowe and didn't need further emergency aid.

At some point during the struggle, my body worn camera fell off and turned off.  I recovered the camera and turned it back on.

I then helped S/A-Stowe to his feet intending to seat him in my patrol car for transport to the jail.  As I went to put Stowe in the back seat of my car from the passenger side, he began struggling.  When I went to put him in the car, he lunged forward landing on the seat before falling into the area where feet go on his back.  Not wanting Stowe to be in this potentially dangerous position, I moved in to help him get to an up right position.  Stowe cocked his foot back and kicked me in the chest knocking me back slightly.  I saw Stowe moving his leg back as if he were going to kick me again, so I quickly grabbed his ankle pulling him out of the back seat of the car.  Stowe landed on his butt on the ground and then Officer Paxton and I turned him on to his stomach (Officer Paxton maintained control of the upper body while I controlled Stowe's legs).

My intention was to hold S/A-Stowe down and wait for the arrival of the WRAP, a lower leg restraint device used to control violent suspects without putting them at risk for positional asphyxia.  While waiting for the WRAP.  I noticed that Stowe was very strong for his size and constantly working to free himself.

Once the WRAP arrived on scene, myself and several other Officers secured S/A-Stowe in the WRAP before placing him in the back on my patrol car.

I then took stock of my condition realizing that my right leg was scrapped just below the knee and my pants had gotten ripped during the struggle.  Further I noticed some blood on my right

| Prepared By: | Date: | Approved By: | Date: |
|---|---|---|---|
| 218    ALFORD, BRAD | 08/26/2017 | 259    JENSEN, GREGORY | 08/27/2017 |



| ROCKLIN POLICE DEPARTMENT - 3104 | Page 6 |
|---|---|
| 4080 ROCKLIN RD    ROCKLIN, CA 95677    916-625-5400<br>NARRATIVE | 17-237-15 |



forearm which turned out to be from S/A-Stowe. I had Officer Barrington take photographs of my condition. Refer to the attached photographs for more details.

When I got in my patrol car, I asked S/A-Stowe for his name. Between swearing at me, I was able to get Stowe's name and age. I ran a check in the system and located a record for Stowe showing him to be on CDC Parole for Burglary as well as Probation out of Sacramento County. I had dispatch look up a picture of Stowe from the system and confirmed his identity.

I told dispatch that S/A-Stowe was under arrest for resisting arrest with violence, battery on a peace officer, and public intoxication. I asked the dispatcher to call CDC Parole to ask about a Parole hold which they later authorized.

I drove S/A-Stowe over to Sutter Roseville Medical Center for the injuries he received during this arrest and to be medically cleared for incarceration at the Placer County Jail. At the hospital, Stowe caused a scene and yelled at the top of his lungs while being taken to a room. Stowe refused to cooperate with the medical staff and was cleared for incarceration with limited screening that the hospital was able to do visually and verbally.

I then placed S/A-Stowe back into my patrol car for transport up to the Placer County Jail. While on the way to the jail, I ran my in car camera and my body worn camera.

At the jail, I had the Deputies remove S/A-Stowe from my car and take him inside for booking. While in the booking area, Stowe continued to go up and down in terms of cooperation and didn't cooperate with the jail nurse.

The jail nurse was concerned about the assessment performed on S/A-Stowe at Sutter Roseville Medical Center telling me I had to take him to Sutter Auburn Faith for further assessment.

Prior to leaving the jail, I tried talking with S/A-Stowe asking him to cooperate, so he didn't have to go back in the WRAP. Stowe was seated in the brown chairs in the booking area where the Deputies normally place un-handcuffed prisoners. I moved in closer to Stowe trying to gain his attention, so he could actually hear what I had to say. Stowe started to get up, he had already attacked me in the field and kicked me, and I didn't want him to head butt me or get the blood on his face on my body, so I reached out with my hand pushing him on the chest and back towards his seat. My hand slid up his chest and to his throat at which point a Deputy yelled "Whoa" while other deputies moved into to control Stowe, so I let go of my grasp and backed up. At that time, I realized Stowe was still in handcuffs.

The Deputies then helped me place Stowe back into the WRAP and back out in my patrol car. I later learned this incident was video and audio recorded in the jail and available if need be. The Sergeant on duty played the video for me and let me know the total incident from start to finish was approximately four seconds.

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 218 | ALFORD, BRAD | 08/26/2017 | 259 | JENSEN, GREGORY | 08/27/2017 |

CONTROLLED DOCUMENT - LAW ENFORCEMENT PURPOSES ONLY

ALFORD 00006



| ROCKLIN POLICE DEPARTMENT - 3104 | Page 7 |
|---|---|
| 4080 ROCKLIN RD    ROCKLIN, CA 95677    916-625-5400<br>NARRATIVE | 17-237-15 |

CONTROLLED DOCUMENT - LAW ENFORCEMENT PURPOSES ONLY

I then drove S/A-Stowe over to Sutter Auburn Faith Hospital running my in car camera and body worn camera for the trip.

At the hospital, several Deputies helped me get S/A-Stowe out of the car and into the hospital. Once inside the hospital, S/A-Stowe refused to cooperate with further testing, then agreed to further testing, and then again refused to cooperate with further testing. I also heard Stowe give his version of events stating that he had fully cooperated with us, and we "beat" him for no reason.

Since S/A-Stowe was still refusing to cooperate, the medical staff did limited verbal and visual assessment before again clearing Stowe for incarceration at the jail.

Deputies came back to the hospital and helped me get S/A-Stowe back in my patrol car. Stowe was verbally defiant with these Deputies yelling at them and calling them obscene names.

I then drove S/A-Stowe back to the jail running my in car and body worn camera. At the jail, various Deputies came out and again brought Stowe back into the jail. Stowe was verbally defiant with these Deputies to also yelling at them and calling them obscene names.

I also did not run my in car camera of body worn camera for the first ride to Sutter Roseville Medical Center because I had not thought about it until we arrived at the hospital, I did run my body worn camera briefly while removing him from my patrol car initially at Sutter Roseville Medical Center.

I turned off my in car camera and body worn camera each time the Deputies interacted with S/A-Stowe because they have their own polices and procedures for how they interact with suspects, and I was not directly involved with their interactions with him.

Additionally, I did not run my body worn camera in the hospital as this is illegal.

As I was getting ready to leave the jail, I noticed some pain and a bruise on the palm of my left hand just under the thumb. I was concerned there may be some sort of fracture, so I contacted Sergeant Jensen and asked to go to the hospital to be checked out. The hospital took several x-rays of my hand and did not believe it was fractured. I took some photographs of my hand. Refer to the attached photographs from me for more details.

CASE DISPOSITION:
Cleared by adult arrest. Forward to the Placer County District Attorney's Office for prosecution.

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 218 | ALFORD, BRAD | 08/26/2017 | 259 | JENSEN, GREGORY | 08/27/2017 |



| ROCKLIN POLICE DEPARTMENT - 3104 | Page 10 |
|---|---|
| 4080 ROCKLIN RD     ROCKLIN, CA 95677     916-625-5400<br>SUPPLEMENT 3 | 17-237-15 |

CONTROLLED DOCUMENT - LAW ENFORCEMENT PURPOSES ONLY

**SUPPLEMENTAL REPORT:**

On 8/25/17 at approximately 1948 hours I was in full uniform in a fully marked police SUV. Officer Alford and I were dispatched to the public portion of the parking lot of 4243 Cedarwood St. We were responding to conduct a welfare check on the report of an unconscious male in the parking lot. I arrived at 1952 hours.

Upon my arrival, the male, later identified as (SA) Stowe, was lying on his back with his head in a landscaped area and his legs in a parking stall. He displayed objective signs of alcohol and/or drug intoxication including slurred speech, confusion, and the odor of an alcoholic beverage emitting from his person. He said he had consumed "one beer." His pants were wet as if he had fallen into a body of water and all of his clothes were very dirty. Officer Alford asked him what his name was and he responded only with "Chris" and said he could not remember his last name. He said he was staying at a sober living facility.

The fire department and paramedics arrived to assist (SA) Stowe. I contacted the manager of the complex with my back to Officer Alford and (SA) Stowe. After a few seconds talking with her, I heard a commotion behind me and heard Officer Alford state "Stop fighting."

As I turned, I saw Officer Alford fall to the ground with (SA) Stowe on top of him. (SA) Stowe's chest was over Officer Alford's thighs in a "mount" style position of advantage. As I ran over, it looked like (SA) Stowe was attempting to crawl up towards Officer Alford's head to achieve a full mount position of advantage. My thought was that (SA) Stowe had either tackled or struggled against Officer Alford causing him to fall given Officer Alford's command to "stop fighting" and because (SA) Stowe was on top of Officer Alford. I feared (SA) Stowe would use his position of advantage to strike down at Officer Alford. I knelt on (SA) Stowe's left side and struck him on the left side of his head with a single elbow strike with my right elbow (landing the strike somewhere near his ear in his hairline). Simultaneously, I grabbed his left wrist with my left hand and twisted it back towards the small of (SA) Stowe's back in a handcuffing position. (SA) Stowe continued to fight against Officer Alford and I. I saw the red shirts of two firefighters (I don't know which firefighters) on (SA) Stowe's right side attempt to gain control of (SA) Stowe's right hand. Officer Alford was able to handcuff (SA) Stowe's right hand followed by his left.

Officer Alford stood (SA) Stowe and brought him to his patrol car. As he attempted to load (SA) Stowe through the rear passenger door, I went to the rear driver's side door to help pull him in. (SA) Stowe continued to struggle against us and slid off the seats. He ended up lying on his back in the foot well of the rear caged area with his shoulders propped up against the plastic molding in the centerline of the cage (his back facing me). I told Officer Alford that I could not pull him through because of the way he was propped up against the molding of the cage. I saw him kick Officer Alford through the open rear passenger door and cock a leg back for another kick. I punched (SA) Stowe (With my right hand in a fist) in the right side of his head to attempt to stop him stop him from kicking as I couldn't pull him any further into the car. Officer Alford pulled him out of car, and he and Officer Paxton (who had recently arrived) rolled him onto his stomach. Officer Alford kneeled across his calves while Officer Paxton

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 283 | BARRINGTON, ANDREW | 08/25/2017 | 259 | JENSEN, GREGORY | 08/27/2017 |



**ROCKLIN POLICE DEPARTMENT - 3104**

4080 ROCKLIN RD      ROCKLIN, CA 95677      916-625-5400

SUPPLEMENT 3

Page  11

17-237-15

CONTROLLED DOCUMENT - LAW ENFORCEMENT PURPOSES ONLY

used the handcuffs to rotate (SA) Stowe's arms upwards into a shoulder lock.  I requested Sergeant Jensen respond with the WRAP device.

Officer Constable, Alford, Paxton and I placed (SA) Stowe into the Wrap maximum restraint device without further incident at 2003 hours.  He was placed into the backseat of Officer Alford's vehicle in a seated position, and was seat belted in.

I took digital photos of Officer Alford immediately after placing (SA) Stowe into the patrol vehicle.

I contacted (RP) Peer who told me the following in summary.  He did not know (SA) Stowe. He found him unconscious in the same condition as described above.  He checked and found that (SA) Stowe had a pulse, and called RPD.  After we arrived he asked if RPD officers still needed him and we told him we did not.  He stayed around to watch and said he saw (SA) Stowe attack the bigger officer (Alford) as he was helping (SA) Stowe stand.  He thought Officer Alford took the suspect to the ground while the suspect fought with RPD officers.  He said RPD officers put the suspect into plastic handcuffs and then into a car.  He saw (SA) Stowe continue to fight with RPD officers when he was being placed into the car.

I went with Officer Alford to the Sutter Hospital in Roseville. While there, I adjusted (SA) Stowe's handcuffs and double locked them as he was complaining of wrist pain.  Officer Alford and I took several digital photos of (SA) Stowe and his injuries, though he was not cooperative with the process and would not hold still.

Once (SA) Stowe was medically cleared and back in Officer Alford's car, I ended my involvement in this call.

Case Status:

Attach to original report.

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 283 | BARRINGTON, ANDREW | 08/25/2017 | 259 | JENSEN, GREGORY | 08/27/2017 |